UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 12-15-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| DAVID JASON JENKINS and | ) | **MEMORANDUM OPINION** |
| ANTHONY RAY JENKINS, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

In 1773, when New York was still a Dutch colony, John Peter Zenger began publishing a newspaper called the *New York Weekly Journal*. NEIL VIDMAR & VALERIE P. HANS, AMERICAN JURIES 42 (2007). The periodical featured several articles and satirical cartoons criticizing the colonial Governor, who proved he was not amused by having Zenger arrested and put in prison on the basis of slander. *Id.* Though Zenger's supporters could have financed his release, he chose to remain in prison to both make a political statement as well as some additional profit from increased newspaper sales. *Id.* A rather sensational trial then ensued in which the Governor frequently used his considerable influence to tilt the scales of justice against Zenger. *Id.* at 43. However, standing between Zenger and the Crown were the common gentlemen of the jury, who rendered a verdict in favor of Zenger and protected the newspaper's rights to gather and report the news for society's benefit. *Id.* Nearly two and a half centuries later a newspaper comes before this Court in a case attracting significant media attention, requesting the removal of

1

several provisions enacted to safeguard their old defender, the jury, who once stood up for the First Amendment rights the newspaper now seeks to invoke.

Though perhaps they do not risk the threats of the 18th Century, even today we expect a great deal from jurors. We command their presence, require that they rearrange their schedules, sometimes for days or weeks, and then ask that they make dramatic choices about the lives of others that can leave the jurors weeping after a difficult verdict rendered late into the evening.

Not surprisingly, courts have traditionally looked for ways to support jurors in their work while protecting the integrity of the jury process. One of the ways both federal judicial districts in Kentucky attempt to accomplish this is by limiting interaction with jurors "before, during or after trial" unless allowed by the court. LCrR 24.1(a). Another method utilized in the Eastern District of Kentucky is restricting access to juror information. General Order 08-13, Jury Plan § 9.1. The Lexington Herald-Leader, Lexington, Kentucky's only daily newspaper, seeks to intervene in this case, the nation's first prosecution of a hate crime on the basis of sexual orientation, to challenge these rules. [R. 149; R. 156]. In sweeping motions, the newspaper asks that both rules be found unconstitutional as applied to the press. It says, the First Amendment and its provision ensuring press freedom demands this result.

LCrR 24.1(a) is good rule but, as explained below, the court is not aware of any instance in which it has been read to prohibit a newspaper reporter from speaking to a willing juror. The reason is the one urged by the Herald-Leader – such an application would generally violate the First Amendment. The rule, however, does not. Additionally, as a corollary to that rule, the district court must be permitted to disclose some information about willing jurors to facilitate this media access. However, this Court does not read General Order 08-13 or Jury Plan § 9.1 to constrain the power of the district court to release the names of willing jurors upon the request of

2

the press when no sufficient countervailing reasons exist to justify impounding them.  For these reasons this Court finds that neither General Order 08-13, nor Jury Plan § 9.1, nor LCrR 24.1(a) should be applied to restrict access to willing juror information or to bar the Herald-Leader from contacting willing jurors following the verdict in *United States v. Jenkins*.   Therefore, this Court grants the Herald-Leader the access it seeks in this case, but refuses to go so far as to deem either rule constitutionally infirm.

# I.

## A.

As an initial matter, the Court must decide a matter of jurisdiction, whether the Lexington Herald-Leader has any right or ability to appear in this prosecution.  The Herald-Leader has styled its petition to this Court in part as a "Motion to Intervene."  [R. 149].  The Sixth Circuit has recognized that unlike civil cases, "no mechanism exists for a private citizen to intervene in a criminal case."  *United States v. Perry*, 360 F.3d 519, 532 n.10 (6th Cir. 2004).  Therefore, formal intervention for the Lexington Herald-Leader is not appropriate.[1]  However, this does not end the analysis.

In the same footnote in which the Sixth Circuit noted that no mechanism existed for private party intervention into a criminal case, it recognized that "we have not always required intervention."  *Id*.  As an example of this proposition, the Sixth Circuit cited *CBS Inc. v. Young*, 522 F.2d 234, 237 (6th Cir. 1975), which is a case concerning an issue substantially similar to the one raised by the Herald-Leader.  In that case, the Sixth Circuit allowed a news organization to appeal a gag order issued by a judge even though that news organization was "neither a party to the litigation nor specifically enjoined by the order from discussing the case."  *Id*.  Therefore,

---

[1] At the Hearing, the Lexington Herald-Leader recognized that formal intervention may not be appropriate,

though a formal intervention is not appropriate in the criminal context, the Sixth Circuit has provided private parties the opportunity to appear in certain cases to challenge an order that might impair their rights in some manner. Just as the gag order provided such an opportunity for the news organization in *CBS Inc.*, so LCrR 24.1(a) provides the same opportunity for the Herald-Leader to appear here in protection of its rights.

In *CBS Inc.,* the Sixth Circuit also makes clear that the media has standing to bring their claim under these circumstances. Specifically, the Sixth Circuit found that the fact that the news organization was not a party in the litigation does not mean it did not suffer injury, as the organization's "ability to gather the news concerning the trial is directly impaired or curtailed." *Id*. at 237-38. Implicit in this analysis is the recognition that the gag order of the judge caused this injury and a court order overturning that gag order would redress this harm, satisfying constitutional standing requirements. Similarly, the Sixth Circuit found that the news organization's claim satisfied the prudential standing requirements as the gag order, "denying to the petitioner access to potential sources of information, at least arguably impairs the rights guaranteed to the petitioner by the First Amendment." *Id*. at 237. According to the court, this made the interest of the news organization "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id*.

By the same rationale, as a direct result of LCrR 24.1(a) the Herald-Leader's ability to gather the news surrounding the *Jenkins* trial has been impaired. This injury would be redressed by an order of this Court. Further, limitations on gathering the news affects a right that is "arguably within the zone of interests" to be protected by the First Amendment." *Id*. Therefore, the Herald-Leader has both constitutional and prudential standing to bring its claim before this

but maintained their right to appear in this action.

Court.

This result should come as no surprise as LCrR 24.1(a) expressly contemplates and provides for such an appearance. The text of rule states that "unless permitted by the Court" no person, party, or attorney can communicate with a jury. Implicit in this language is the notion that someone who was not a party or attorney in an action could rightfully appear before the court and petition for permission to contact the jury that had been empanelled and rendered a verdict in that particular case. As a result, the Herald-Leader has standing.

## B.

### 1.

The Herald-Leader claims that LCrR 24.1(a) is an unconstitutional burden of the freedom of the press. In full, LCrR 24.1(a) states that, "Unless permitted by the Court, no person, party or attorney, nor any representative of a party or attorney may contact, interview, or communicate with any juror before, during or after trial." The purpose of this rule is not to stifle the media or create some insidious barrier to their gathering of the news related to federal court proceedings. Instead, this rule is a mere extension of the privacy provided jurors during their deliberations.

For important reasons, jurors consider evidence and deliver verdicts in courtrooms open to the public, but have historically deliberated in private and received a measure of confidentiality once their work is done. Daniel Aaron, *The First Amendment and Post-Verdict Interviews*, 20 Colum. J.L. & Social Problems 203, 203 n. 228 (1986). Dating back to the Fourteenth Century, the courts of England endeavored to devise strategies to protect against corruption and intimidation of the jury. *Id.* "As early as 1354, Parliament is petitioned to compel all evidence to be brought to the bar and allow no one access to the jury afterward." *Id.*

5

(citing M. RADIN, HANDBOOK OF ANGLO-AMERICAN LEGAL HISTORY 215 (1936)). Blackstone described the jury as being, "delivered from confinement" to give their verdict to the judge. *Id*. (citing 3 WILLIAM BLACKSTONE, COMMENTARIES *377 (1768)). So jealously guarded from potential outside interference were the juries of the past that Steinhook described them as being, "shut up famished as captives, with no one intruding, until they had absolved or condemned." *Id*. (citing STEINHOOK, DE JURE SUEONUM ET GOTHORUM, HOLMIAE (1672)).

Within the walls of the jury room, the jurors must be able to expel from their minds external concerns and apply the facts as they see them to the law given by the judge. If during that sacred time jurors must worry that the fair and impartial decision they make in the jury room will lead to harassment and molestation from the parties, the attorneys, or others when they leave it, a major blow is dealt to the administration of justice. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 553 (1976) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences…strong measures must be taken by the trial court to ensure that the balance is never weighed against the accused.").

The rule not only safeguards the administration of justice, but also protects the safety of jurors themselves. In this case, for example, the defendants were convicted of very serious crimes and readily admitted to engaging in a physical altercation with the victim. Also, as a function of the defendants' acquittal in the nation's first prosecution of a hate crime based on sexual orientation, the local government has received a communication from a gay and lesbian advocacy group that several thousand of their members intend to protest at the courthouse during the sentencing of the defendants. LCrR 24.1(a) operates as a proactive protective measure to help ensure that after the jurors complete their public service, they will not find themselves to be the next victim of violence or their homes to be the next gathering place for thousands of

6

protesters following the sentencing proceeding.

However, even the weighty interest of society in the fair administration of justice and protection of jurors has limits. Newsgathering is an activity that is protected by the First Amendment. *Boddie v. American Broadcasting Companies, Inc*., 881 F.2d 267, 271 (6th Cir. 1989) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). This is because, "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id*. (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980)).

The Sixth Circuit has applied these principles to find that a "post-trial judicial gag order…would trammel first amendment values and fail to pass constitutional muster." *In re Memphis Pub. Co.*, 887 F.2d 646, 649 (6th Cir. 1989). Further, the Sixth Circuit has found that in certain cases gag orders constitute prior direct restraints by the government upon First Amendment freedoms of expression and speech. *CBS Inc.*, 522 F.2d at 238. As such, they are subject to the closest scrutiny and there is a heavy presumption against their constitutional validity. *Id*. (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). Before such an order restricting speech can be upheld there must be, "a serious and imminent threat to the administration of justice. *Id*. (quoting *Craig v. Harney*, 331 U.S. 367, 373 (1947)).

The Herald-Leader states that not only is LCrR 24.1(a) comparable to the gag order forbidden in *CBS Inc.*, but "is more restrictive and less justifiable." [R. 149 at 4]. And while this might be true of a specific order of this Court restricting post-verdict jury access under these circumstances, the LCrR 24.1(a) itself is distinct from a gag order. In *CBS Inc*., the trial judge entered a full gag order stating as follows:

> For good cause appearing, it is ORDERED that in addition to all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates are hereby ORDERED to

> refrain from discussing in any manner whatsoever these cases with members of the news media or the public.

*CBS Inc.*, 522 F.2d at 236. Specifically, the court characterized the order by stating, "in sweeping terms it seals the lips of all parties concerned with the litigation," effectively removing the significant sources the press could use to gather the news. *Id* at 238.

LCrR 24.1(a) does not sweep so broadly. Instead, its reach is far less than the *CBS Inc.* gag order. Where that prohibition concerned the speech of nearly everyone involved in the litigation, LCrR 24.1(a) concerns media access only to jurors. As a practical matter, this is a significant difference. The media coverage of the *Jenkins* trial, for example, was robust throughout the proceeding. Several reporters attended the trial daily and provided the public with frequent updates concerning the happenings of the courtroom. Following trial, many news outlets contacted representatives of the parties and received comment from the defense as well as from the United States Department of Justice on the case.

Further, unlike the gag order in *CBS Inc.*, even the preliminary restrictions of LCrR 24.1(a) do not permanently seal the lips of the jurors without exception. This Court did not set forth a blanket order that the jurors were not to speak with the media, nor does LCrR 24.1(a) represent such a general prohibition.[2] Instead, the rule expressly empowers the trial court to provide media access to jurors upon the petition of an interested news organization. In this way the rule does not erect an impenetrable wall of partition between the jury and the media, it simply provides for an intermediate step that the press must take before contacting jurors. And this step

---

[2] At the hearing, the Herald-Leader suggested that this Court's reading of the rule could have been construed by the jury as a blanket order prohibiting contact with the media. However, no such order was made by this Court beyond simply reading the text of the rule. The effect of doing so is clearly seen in this case, as one juror who wanted to contact the media about the case simply notified the court of his intention and freely received permission to do so. As a result, his opinion article has already been published in the Herald-Leader. Chuck Owens, *Ky. Voices: Hate-Crime Trial Revealed Deep Dysfunction*, Lexington Herald-Leader, November 4, 2012, *available at* http://www.kentucky.com/2012/11/04/2395612/ky-voices-hate-crime-trial-revealed.html.

is not onerous.  In the context of post-trial juror contact by the media, this requirement is read by this Court not as a substantive prior restraint, but as merely an administrative procedure to allow the court to ensure that other protected constitutional rights are not trammeled in granting the media access to jurors.  The narrowed scope in conjunction with this safety valve effectively distinguishes LCrR 24.1(a) from the unconstitutional *CBS Inc*. gag order.

**2.**

The Herald-Leader next asks this Court to consider the rationale of the Fifth Circuit, which has considered a local rule similar to LCrR 24.1(a).  *In re Express-News Corp.*, 595 F.2d 807 (5th Cir. 1982).  Local Rule 500-2 of the Western District of Texas stated that no person shall, "interview…any juror, relative, friend, or associate thereof with respect to the deliberations or verdict of the jury in any action, except on leave of court granted upon good cause shown." *Id*. at 808.  When the Express News Corporation filed a motion to vacate the restrictions on the media and seek leave to interview the jurors, the district court denied the motion pursuant to Local Rule 500-2.  *Id*.  The Fifth Circuit recognized that the First Amendment protected the rights of the media to gather the news, but also that this right is limited by the Sixth Amendment rights of the accused to a fair trial.  *Id*. at 809.  As such, extrajudicial statements of party participants could be restricted to ensure the fairness of a pending trial and "jurors, even after completing their duty, are entitled to privacy and protection against harassment."  *Id*. at 810 (citing *United States v. Gurney*, 558 F.2d 1202, 1210 (5th Cir. 1977)).  "A court rule cannot, however, restrict the journalistic right to gather news unless it is narrowly tailored to prevent a substantial threat to the administration of justice."  *Id*. (citing *United States v. CBS, Inc.*, 497 F.2d 102, 104 (5th Cir. 1974)).

The Fifth Circuit found neither the rule nor the order to be sufficiently narrowed to

9

survive this constitutional test.  The court was especially critical of requiring the media to affirmatively demonstrate "good cause" for contacting the jurors.  *Id*. at 810.   In the court's view, "the first amendment right to gather the news is 'good cause' enough," and the "government must carry the burden of demonstrating the need for curtailment." *Id*.  The Fifth Circuit ultimately held that because the Express News Corporation's right to gather news was restricted without any showing that the restriction was necessary, "the rule and the denial of leave of the petitioners are unconstitutional as applied to the interviews sought to be conducted." *Id*. at 808.

The Herald-Leader states that *In re News-Express Corp.,* "could not be more squarely on point," and as a result this Court should likewise find LCrR 24.1(a) to be unconstitutional.  [R. 149 at 6].  However, the Fifth Circuit has recognized that "*Express-News* marks only the beginning of this court's cases on post-verdict access to jurors…"  *United States v. Brown*, 250 F.3d 907, 920 (5th Cir. 2001).  In fact, following *Express-News Corp.*, the Fifth Circuit upheld a court order wherein the district judge stated, "absent a special order from me, no juror may be interviewed by anyone concerning the deliberations of the jury."  *United States v. Cleveland*, 128 F.3d 267, 269 (5th Cir. 1997).  The Court found this order to be less offensive to the First Amendment in part because it did not require the press to demonstrate good cause before the judge permitted access to the jurors.  More specifically, the court stated that "this order does not purport to shift to the media the burden of demonstrating the need for curtailment, and is in this respect distinguishable from *Express-News Corp*."  *Id*. at 270 (internal quotes omitted).

The next case in the line of Fifth Circuit decisions concerning post verdict access to jurors is *United States v. Brown*, 250 F.3d 907, 920 (5th Cir. 2001).  In *Brown*, the district court asked the jurors if they would be willing to speak to the media following their release.  After

each juror declined to make himself available, the judge indicated that if they should change their minds, to simply let him know and he would release their information to the media. The court distinguished this case from *Express-News Corp*. and relied on *Cleveland* to find that the order was sufficiently narrow to avoid running afoul of the First Amendment. Specifically, of the order the Fifth Circuit stated:

> It has no requirement for a showing of good cause for conducting post-verdict interviews. It merely states that the court will not release juror information without the juror's consent. The judge affirmatively asked the jurors whether they wished to relinquish their privacy. Any juror may, at any time, voluntarily decide to relinquish his confidentiality. The only restriction placed on such interviews is the court's instruction that jurors may not be interviewed concerning juror deliberations absent a special order from the judge. This is consistent with our understanding that "[c]ompelling governmental interest[s] in the integrity of jury deliberation require that the privacy of such deliberations and communications dealing with them be preserved." *Gurney,* 558 F.2d at 1210–11.

*Id*. at 921.

Like the order in *Cleveland* and *Brown*, LCrR 24.1(a) is distinct from the local rule in *Express-News Corp*. In the context of LCrR 24.1(a), no "good cause" requirement is placed on the petitioner. The Herald-Leader rightly notes that the rule does require an entity requesting to contact the jurors seek an order of the court to do so. However, in the context of post-trial contact by the media, this requirement is read by this Court as merely a housekeeping or administrative procedure to allow the court to gauge the willingness of the jurors for media contact and give the government an opportunity to raise any possible objection to juror contact that it might have in a particular case. Such a process is implicitly contemplated by the Fifth Circuit in *News-Express Corp*., and approved of in *Cleveland* and *Brown*, each of which recognized in some instances a limitation of access is, in fact, appropriate to protect the integrity of the jury process and the administration of justice. No specific burden is articulated in the text

of the rule, allowing the court flexibility in making a decision that is informed by the facts of a particular case and in light of relevant case law. [3]  In this manner, LCrR 24.1(a) survives the constitutional infirmity that the local rule of the Western District of Texas in *News-Express Corp.*, could not.

### 3.

The depth of analysis on the issue by the Fifth Circuit makes its case law informative, but this Court is bound by the rulings of the Sixth Circuit.  Though LCrR 24.1(a) is clearly distinct from the gag order prior restraint analysis of *CBS Inc*., and the Sixth Circuit has not considered limitations on post-verdict access to jurors, the court is aware of the presence of this rule. Pursuant to 28 U.S.C. § 1863, this district is required to submit a Jury Plan for the approval of the Sixth Circuit.  In the Second Amendment to the Jury Plan, Rule § 9.6 was added, which states:

> Unless permitted by the Court, no party or attorney – or the representative of a party of attorney – may contact, interview, or communicate with any juror before, during or after trial.  No person may contact, interview, or communicate with any juror on any matter relating to the trial before or during trial, see Local Rule 47.1 and Local Criminal Rule 24.1(a).

Despite the inclusion of this rule, which refers to and is similar[4] to the language of LCrR 24.1(a), the Jury Plan was, "duly received and approved as complying with the law by a reviewing panel consisting of the members of the Judicial Council of the U.S. Court of Appeals for the Sixth Circuit Court of the United States," as indicated by a Certificate of Approval signed by then-

---

[3] For example, as will be discussed, the Sixth Circuit suggests that for this court to issue an order precluding contact with willing jurors under these circumstances, the burden would be on the government to show that the media's exercise of its First Amendment rights to gather the news are outweighed by a substantial threat to the administration of justice.  *CBS Inc.*, 522 F.2d at 239.

[4] Though Jury Plan § 9.6 is similar, its distinction from Local Criminal Rule 24.1(a) would not have precluded the juror contact that the Herald-Leader seeks in this case.  Perhaps this formulation will inform the work of the Joint Local Rules Commission should it recommend a further amendment to LCrR 24.1(a).  However, for the present purposes, the reference to LCrR 24.1(a) in a similar rule does tend to suggest the Judicial Council of the

Chief Judge Danny Boggs.  Therefore, a rule that was created by all of the judges of the Eastern District of Kentucky and referred to in a Jury Plan approved by the Sixth Circuit Court of Appeals, will not be casually set aside by this court.

The Herald-Leader has expressed its intention to ask this Court to find LCrR 24.1(a) unconstitutional in the short term, and to petition the Joint Local Rules Commission[5] for a change in the text of the rule going forward.  [R. 149 at 2].  When it does so, the Herald-Leader is free to petition the Joint Committee to set a rule that the media may always contact jurors post-trial unless the court makes specific findings on the record and orders otherwise.  However, as it currently stands, the Joint Committee has chosen to formulate LCrR 24.1(a) in a manner that if the media would like to contact the jurors following a case it must first notify the court and receive an order.  Such a rule might be inconvenient to the Herald-Leader, but it is not unconstitutional and therefore must be followed by this Court.

## 4.

Though the rule itself is not unconstitutional, as applied to this case, an order of this Court that the media was forbidden from contacting willing jurors would constitute an impermissible prior restraint indistinguishable from the effect of the gag order in *CBS Inc.*, or the joint rule in *In re News-Express Corp.*  As such, it would be evaluated under the same test and would not stand unless this Court articulated "sufficient specific findings," that contacting the jurors constituted a "serious and imminent threat to the administration of justice."  *CBS Inc.*, 522 F.2d at 239.  In applying the rule, a court must balance the interest of the parties in a fair trial by impartial and objective jurors against First Amendment rights, like that of the media to gather the

---

Sixth Circuit was aware of the  local rule.

[5] The Joint Local Rules Commission, comprised of judges and practitioners, recommends local rules and revisions for both the Eastern and Western Districts of Kentucky.

news.

In some cases, the constitutionally protected interest of society in a fair trial and proper administration of justice outweighs the First Amendment free speech rights of others. LCrR 24.1(a) prohibits the attorneys, the parties, and even other people like the families of the defendants or the victim from threatening the jurors during a pending trial or contacting the jurors and demanding an explanation for their verdict. In such cases, society's interest in the administration of justice overcomes any countervailing interest related to speech. Moreover, the rule also proscribes contact with the jurors by the media during the trial and in the course of deliberations. Again, the administration of justice trumps the media's interest.

However, once the jury has rendered its verdict, the threat to the administration of justice is usually no longer so great as to justify curtailing the First Amendment rights of the press, and thus the media will generally be freely permitted by the court to contact and interview a willing juror at that time under LCrR 24.1(a). Neither the government nor the parties registered an objection to the Herald-Leader's motion, and no persuasive reason is apparent as to why this general rule should give way due to the special circumstances of this case. Therefore, by order of this Court pursuant to LCrR 24.1(a), the Herald-Leader may rightfully contact and interview any willing juror from the trial of *United States v. Jenkins*.

This outcome is not remarkable. Despite much sound and fury by the Herald-Leader as to the limitations of LCrR 24.1(a), the newspaper was unable to produce a single circumstance wherein this Court or any other court in the federal districts of Kentucky has ever utilized this rule to order a blanket prohibition of media access to jurors. This suggests that unlike the rule in Western District of Texas, LCrR 24.1(a) is neither written nor read so broadly as to categorically bar the media from contacting jurors, and applying it to bar the Herald-Leader in this case would

14

be inappropriate.

## C.

The Herald-Leader next expresses concern that even with the Court's blessing to contact willing jurors, current court procedures render their reporters incapable of doing so. According to the Herald-Leader, the prevailing rules governing the manner in which courts in this district are required to select and manage juries prohibit this Court from releasing the names of jurors under any circumstances. In the view of the newspaper, such a rule runs afoul of their First Amendment right to gather the news by restricting access to potential sources.

In 28 U.S.C. § 1863, the Jury Selection and Service Act of 1968, each United States district court is required to, "devise and place into operation a written plan for random selection of grand and petit jurors." The plan is reviewed and approved by members of the judicial council of the circuit and the chief judge of the district or his or her designee. The plan may be amended by the district court at any time. Specifically, the plan must, "fix the time when the names drawn from the jury wheel shall be disclosed to the parties and to the public." 28 U.S.C. § 1863(b)(7). Importantly, the statute states that, "if the plan permits these names to be made public, it may nevertheless permit the chief judge of the district court or such other district court judge as the plan may provide, to keep the names confidential in any case where the interests of justice so require." *Id.* In addition, the jury plan must also, "specify the procedures to be followed by the clerk of jury commission in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels." 28 U.S.C. § 1863(b)(8).

Pursuant to these statutory requirements, the Eastern District of Kentucky has promulgated its Amended and Restated Plan Providing for Jury Selection and Service System in All Jury Divisions of the District ("Jury Plan"). The original Jury Plan was signed by the each

district judge from the Eastern District of Kentucky by June 26, 2002.  The initial jury plan was approved by the Sixth Circuit as indicated by the signature of the Honorable Boyce Martin, then-Chief Judge of the Sixth Circuit Court of Appeals.  At that time, the jury plan contained the following rule concerning the disclosure of jury names:

> Within three days after jurors are summonsed for service from the juror lists which were drawn from the qualified wheel a list of names of those summonsed shall be available to the parties and the public unless otherwise ordered by the Court.

Jury Plan § 9.1.

Section 9 of the Jury Plan concerning juror names was amended in 2005, and while § 9.1 remained unchanged, § 9.6 was added to track the language of LCrR 24.1(a), which has previously been discussed.  The reviewing members of the Judicial Council of the U.S. Court of Appeals for the Sixth Circuit certified its approval of this amendment as indicated by the signature of then-Chief Judge Danny Boggs.

The Third Amendment to the Jury Plan is the one relevant to the challenge by the Herald-Leader.  In 2008, § 9.1 was amended to comply with then-Chief Judge of the Eastern District of Kentucky's General Order 08-13, which both stated as follows:

> Upon request, the Jury Clerk shall make petit juror information forms available to counsel for the parties seven days prior to trial for use in preparation for and during voir dire subject to the provisions of LR 47.1(a) and LCrR 24.1.  Under no circumstance shall juror information be provided to any other person or entity.

Jury Plan § 9.1(a) Third Amendment.  Again, this amendment was approved by a review panel consisting of the members of the Judicial Council of the Sixth Circuit of the United States as indicated by the signature of then-Chief Judge Danny Boggs.  It would seem unlikely that the Sixth Circuit would have approved this amendment to the jury plan if it agreed with the Herald-Leader that § 9.1 was unconstitutional.

16

Beyond its approval of the Eastern District of Kentucky's Jury Plan, the Sixth Circuit has not expressly considered the constitutionality of a plan denying media access to juror names; however, several other circuits have had the opportunity to do so. A panel of the First Circuit, including now-Justice Breyer, recognized a potential clash of constitutionally protected interests that are bound up in this issue.

> On the one hand, impounding juror names implicates the press's First Amendment right of access to criminal trials. See Press Enterprise Co. v. Superior Court, 478 U.S. 1, 8-9, 106 S.Ct. 2735, 2740-41, 92 L.Ed.2d 1 (1986) (Press Enterprise II ). On the other hand, disclosure may implicate the defendant's Sixth Amendment right to a fair trial. See Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507, 1522-23, 16 L.Ed.2d 600 (1966); In re Globe Newspaper Co., 729 F.2d 47, 52-53 (1st Cir.1984). Also, the jurors themselves have an interest in having their privacy protected. See Press Enterprise Co. v. Superior Court, 464 U.S. 501, 510-13, 104 S.Ct. 819, 824-26, 78 L.Ed.2d 629 (1984) (Press Enterprise I ).

In re Globe Newspaper Co., 920 F.2d 88, 93 (1st Cir. 1990). However, the First Circuit did not resolve the case on the basis of the First Amendment. Instead, the court considered the district judge's order impounding the names of jurors in light of the district's jury plan and 28 U.S.C. § 1863.

Importantly, the court noted that "The second sentence in § 1863(b)(7) is, to be sure, prefaced with words, 'if the plan permits these names to be made public…' suggesting that a local plan might optionally decline to permit juror names to be made public at all." Id. at 92. The Court then added that according to legislative history, this language was included in the rule to accommodate the current practice of some districts who "keep juror names confidential for fear of jury tampering." Id. (citing H.R. Rep. No. 1076, 90th Cong., 2d Sess.).

However, the First Circuit reviewed the district's jury plan to determine that the district did not choose to keep juror names confidential but provided for such a practice only when the

interests of justice provided.  Though the Globe Newspaper Company thought this standard unconstitutional, the Court recognized that the Supreme Court has set forth a policy, "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."  *Id.* at 93 (citing *Gomez v. United States*, 490 U.S. 858 (1989)).  Therefore, the court found the rule constitutional by construing it to require the judge to make specific findings of exceptional circumstances before withholding the identity of jurors.  *Id.* at 99.  Finding that the court did not abide by this rule, the First Circuit struck down the judge's order denying media access to juror information.  *Id.*

The Fourth Circuit has also considered this issue in the context of a district court order denying media access to juror names during the pendency of trial.  The Court did not look back to the Jury Plan or base its decision on First Amendment grounds, but instead relied on the historical nature of the jury.  Specifically, the Fourth Circuit found:

> When the jury system grew up with juries of the vicinage, everybody knew everybody on the jury and we may take judicial notice that this is yet so in many rural communities throughout the country. So, everyone can see and know everyone who is stricken from a venire list or otherwise does not serve….But the anonymity of life in the cities has so changed the complexion of this country that even the press, with its vast and imaginative methods of obtaining information, apparently does not know and cannot easily obtain the names of the jurors and of the veniremen and women who did not serve in this case. We think it no more than an application of what has always been the law to require a district court, upon the seating of the panel of a jury and alternates, if any, which will hear a case, to release the names and addresses of those jurors who are sitting, as well as those veniremen and women who have attended court but have not been seated for one reason or another.

*In re Baltimore Sun Co.*, 841 F.2d 74, 75 (4th Cir. 1988).  Therefore, the Court ordered the district court to release the juror's names and addresses.

However, because of 28 U.S.C. § 1867(f), the court refused to order the release of additional information.  *Id.* at 76.  Section 1867 states, "the contents of papers used by the jury

commission or clerk in connection with the jury selection process shall not be disclosed, except pursuant to the district court plan…" and provides for a fine for any person who discloses any such information. The Fourth Circuit concluded, "We do not think, however, that because one is summoned to jury duty that his entire background as disclosed to the court on his questionnaire is necessarily and immediately subject to public scrutiny." *Id.*

The Third Circuit reached a similar conclusion concerning public access to juror information prior to empanelment, but did so using the First Amendment constitutional analysis that the Herald-Leader urges this Court to adopt. *United States v. Wecht*, 537 F.3d 222, 224 (3rd Cir. 2008). At issue in *Wecht* was an administrative order stating "all jurors shall be identified in court during the jury selection process by his number ONLY." *Id.* The order further provided that jury lists were confidential and property of the court, and as such could not be removed from the court at any time. *Id.* The media-intervenors challenged the order of the trial judge pursuant to this rule on the basis that the First-Amendment "creates a right of access that requires disclosure of juror names." *Id.* at 233.

The Court found that the "experience and logic test" articulated by the Supreme Court in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*") was the appropriate analysis in determining whether this order was proper under the First Amendment. *Id.* at 233-234. The court characterized this "experience and logic test" as follows:

> This test requires courts to weigh two "complementary considerations." *Id.* at 8, 106 S.Ct. 2735. Under the "experience" prong, a court considers "whether the place and process have historically been open to the press and general public." *Id.* Under the "logic" prong, a court considers "whether public access plays a significant positive role in the functioning of the particular process in question" by, *inter alia,* enhancing "both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 8-9, 106 S.Ct. 2735 (citation omitted). If an aspect of a criminal trial "passes these tests of experience and logic, a qualified First Amendment right of public access

attaches." *Id.* at 9-10, 106 S.Ct. 2735. As *Press Enterprise I* made clear, even when such a right of access exists, it is merely presumptive and may be overcome if the District Court articulates specific facts that justify closure.

*Id.* at 234 (citing *Press-Enterprise II*, 478 U.S. at 8-10).

Concerning the experience prong, the Third Circuit essentially imported the Fourth Circuit's aforementioned historical analysis to find that juror names have been traditionally available to the public. *Id.* at 236 (citing *In Re Baltimore Sun Co.*, 841 F.2d at 75). Under the logic prong, the Third Circuit borrowed from the First Circuit's discussion of the benefits of open access to juror information, including an increased level of transparency that would expose any corruption and inspire enhanced public faith in the jury system. *Id.* at 238 (*In re Globe Newspaper Co.*, 920 F.2d at 94). Because both prongs of the test were met, the Third Circuit found that a presumptive First Amendment right of access to juror names attaches no later than the swearing in and empaneling of the jury. *Id.* at 239. Though the trial court provided three reasons for ordering the names to be held confidential, the Third Circuit found them insufficient to overcome the presumption that juror names should be available to the public, and therefore vacated the district court's order on First Amendment grounds. *Id.* at 243.

And though each of these three circuits has ultimately ordered the release of juror names to members of the press, this is not a unanimous view. The Fifth Circuit, whose rationale in *News-Express Corp.* was so strongly recommended to this Court by the Herald-Leader, has refused to recognize a constitutional right for members of the press to access juror names. *United States v. Gurney*, 558 F.2d 1202, 1211 (5th Cir. 1977). The Court noted the warning of the Supreme Court that, "Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial court must take strong

20

measures to ensure that the balance is never weighted against the accused." *Id*. at 1209 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966)). The court stated that "Confidentiality is a shield against external considerations entering into the deliberative process...Juries must be permitted to deliberate fully and freely, unhampered by the pressures and extraneous influences which could result from access by the press to the deliberative process." *Id*. at 1211. The Fifth Circuit further stated, as the Herald-Leader argued at the hearing, that "the press is entitled to no special access to information that is not shared by members of the public generally." *Id*. at 1208 (citing *Pell v. Procunier*, 417 U.S. 817 (1974)). Therefore, because the juror names were not part of the public record, the Fifth Circuit found that, "we do not think that the press had any First Amendment right of access to those matters not available to the public." *Id*. (citing *Garrett v. Estelle*, 556 F.2d 1274 (5th Cir. 1977)).

The Fifth Circuit reaffirmed this holding in *United States v. Brown*, 250 F.3d 907 (5th Cir. 2001). Herein, the Fifth Circuit stated:

> While a denial of access to confidential court information may hamper newsgathering, this burden is thought to be incidental when strong governmental interests are involved. *Gurney*, 558 F.2d at 1209. Ensuring that jurors are entitled to privacy and protection against harassment, even after their jury duty has ended, qualifies as such an interest in this circuit. *United States v. Harrelson*, 713 F.2d 1114, 1116 (5th Cir.1983); *Express–News*, 695 F.2d at 810; *Gurney*, 558 F.2d at 1210 n. 12 ("[T]he judge was following a well-established practice when he refused to publicly release the jury list, which included the names, addresses, and other personal information about the jurors. Such protection of the privacy of the jurors was clearly permissible, and certainly appropriate in a trial which attracted public attention as this one did."). The judge's power to prevent harassment and protect juror privacy does not cease when the case ends. Harrelson,713 F.2d at 117.

*Id*. at 918. As a result, the court endorsed the district court's procedure for managing the competing First Amendment interests of the media, society's interest in a fair trial, and the jury's interest in privacy. Specifically, the district court, "polled members of the jurors before releasing

them from service to ask whether they wished to have their names made public." *Id*. at 920. Though none desired to waive their anonymity, "the judge informed the jurors that if anyone later wanted to have his identity released, he could do so." *Id*. The court approved of this mechanism as a means of protecting the jurors from unwanted harassment. *Id*.

The Herald-Leader now asks this Court to wade into this constitutional debate to determine whether the First Amendment demands that the press be granted access to the names of jurors. However, this court need not decide the constitutionality of a provision that bars a trial judge from revealing juror names. Though it is possible to read General Order 08-13 and Jury Plan § 9.1 as such a rule, a more restrictive reading is better here. Both General Order 08-13 and Jury Plan § 9.1 begin with the phrase, "upon request, the *Jury Clerk*..." (emphasis added). Thus, this express language applies both the rule and order to the Jury Clerk. A rule that prohibits the Jury Clerk from turning over juror information is consistent with 28 U.S.C. § 1867(f), which states, "the contents of papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except pursuant to the district court plan…" Whether or not the scope of the rule extends beyond the Jury Clerk, the express language of the rule does not apply it to the trial court. As a result, this Court reads neither General Order 08-13 nor Jury Plan § 9.1 to constrain the power of the trial court to manage the jury or release the information of its members.[6]

In addition, the Jury Plan and the General Order makes the rule subject to LCrR 24.1. As has been discussed in detail, this local rule permits juror contact upon the order of the court. A corollary of this rule must be that if the court can permit juror contact it must also be that the

---

[6] Given the Court's holding, it may very well be that the judges of the Eastern District decide to revisit the wording of General Order 08-13 and Jury Plan § 9.1. However, nothing about this Court's holding presupposes the necessity of any change.

court can order release of the names of willing jurors to facilitate this contact.  Neither the Jury

Plan nor the General Order necessarily forbids this outcome.  Further, though the Jury Plan does

not expressly provide a standard that should be employed by the trial court in granting juror

access, as previously discussed, LCrR 24.1(a) leaves the decision to the discretion of the trial

court in light of the particular circumstances and relevant law available on the issue.  28 U.S.C. §

1863 provides that the court should be able to impound the names of the jury where the interests

of justice so require.  In this case, the Court has no hesitation in releasing the names of the jury,

where the parties have no objections and there is no concern that interest of justice requires

confidentiality.  Therefore, though this Court refuses to find the Sixth Circuit approved Jury Plan

§ 9.1 and General Order 08-13 unconstitutional, it also does not read it to bar the release of the

names of willing jurors to the Herald-Leader in this case, where the interest of justice does not

require this court to do so.

      However, the method by which this information is disseminated must be exercised with

care.  The Herald-Leader should not consider anything in this Order to constitute an unbounded

mandate to track down and demand information from jurors.  The media has the right to contact

jurors in an effort to gather the news, but the jurors have no obligation to provide the media with

any information about their service or their deliberation.  "The jurors' freedom of speech is also

freedom not to speak."  *In re News-Express Corp.*, 695 F. 2d at 811.  Further, jurors have no

power to discuss the votes of other jury members who might not wish their discussions to be

made public.  *Id*. at 810.

      In facilitating a strategy whereby the press may acquire the contact information for the

jury members in the case of *United States v. Jenkins* without creating unwanted exposure of

unwilling jurors, the court finds that the model approved by the Fifth Circuit in *Brown* to be

efficacious. *Brown*, 250 F.3d at 920.  Therefore, this Court will contact all members of the jury in this case in writing.  The court shall inform them of their right not to speak with the media, but request that if they are amenable to speaking with the media concerning their service as a member of the jury, then they should communicate that willingness to the court.  Once received by the court, this information will be provided by the court to the Herald-Leader.

## II.

In sum, LCrR 24.1(a) is not facially unconstitutional and operates as safeguard to protect jurors from harassment and molestation once they have served their country by considering the evidence in a case and rendering a verdict.  However, courts in the federal districts of Kentucky have never denied a member of the press who petitions under LCrR 24.1(a) post-trial access to a willing juror, and this Court will not do so today.   The reason for this grant of access is that following the verdict at trial, the right of the press to gather the news through contact of the jury no longer generally poses a threat to the administration of justice, and the government has provided no compelling argument that specific circumstances exist that would alter that analysis in this particular case.

Additionally, this Court refuses to find General Order 08-13 and Jury Plan § 9.1 unconstitutional.  However, this Court also does not read these provisions to bar the release of the names of willing jurors to the Herald-Leader in this case where the interests of justice does not require this Court to do so.  Therefore, this Court shall contact in writing the jurors from this case to inform them of their rights and to ask them to indicate their willingness to be contacted by the press.  The information of all willing jurors shall then be forwarded to the Herald-Leader, allowing them both the information and the access it seeks.

24

In arriving at this conclusion, the Court recognizes that formal intervention by the Herald-Leader is not appropriate, but LCrR 24.1(a) and related case law does provide a member of the press the opportunity to appear before the court to seek its right to contact members of the jury in gathering the news.  Thus, while the Court denies the Herald-Leader's motion to intervene and its motion to declare LCrR 24.1(a) and General Rule 08-13 unconstitutional, the motion shall also be construed as a petition under LCrR 24.1(a) for an Order of the Court to release the information of willing members of the jury from the case of *United States v. Jenkins*, and to permit contact those with willing jurors, which is granted.

### III.

Accordingly, it is hereby **ORDERED** as follows:

(1)    The Herald-Leader's Motion to Intervene [R. 149] is **DENIED**.

(2)    The Herald-Leader's Motion to Set Aside LCrR's Prohibition Against Contact with Jurors [R. 149] is **DENIED**.

(3)    The Herald-Leader's Motion for Access to Juror Names and Addresses [R. 156] is **DENIED**.

(4)    The Herald-Leader's Motion under LCrR 24.1(a) for an Order of the Court to release the information of willing members of the jury from the case of *United States v. Jenkins*, and to permit contact with those willing jurors [R. 149, 156] is **GRANTED**.

This 20th Day of November.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge