UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO.  12-CR-00015-GFVT          *ELECTRONICALLY FILED*

UNITED STATES OF AMERICA                                                           PLAINTIFF

V.     **SENTENCING MEMORANDUM AND RESPONSE TO OBJECTIONS**

ANTHONY RAY JENKINS                                                                DEFENDANT

\* \* \* \* \*

The Defendant was convicted after a jury trial of Conspiracy to Kidnap and Kidnapping.  The Defendant is subject to a sentence of up to life imprisonment on both offenses with an applicable advisory guideline range of 235-293 months imprisonment.

The factors set forth in 18 U.S.C. § 3553(a), include but are not limited to, the nature and circumstances of the offense and history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Defendant's conduct in this case is extraordinarily violent.  On the evening of April 4, 2011, the Defendant (Anthony), David Jason Jenkins (Jason), Ashley Mable

Jenkins (Ashley), and Alexis Leeann Jenkins (Alexis) were at a residence on Russell Drive in Harlan County, Kentucky. Jason and Anthony began talking about finding somebody to fight. Jason suggested Kevin Pennington (Pennington) and made statements about "unfinished business" he had with Pennington. Jason and Anthony referred to Pennington as a "faggot" during the discussion. Jason and Anthony came up with a plan to go to Pennington's residence and have Ashley and Alexis lure Pennington into Anthony's truck by telling Pennington they were going to get drugs. They all knew Pennington would not get in the truck with Jason and Anthony if he knew they were in the truck because of a prior assault involving Pennington's friend a few years earlier which was set forth in detail during the testimony of Pennington's friend during a pretrial hearing in this matter.

  The 2009 assault took place after Jason, Anthony and Anthony's brothers, Austin and Alex, arrived at Pennington's house unannounced. They invited Pennington and his friend to a bonfire. When they arrived at the location, there was no bonfire. Austin led Pennington away from the group. Jason and Anthony brutally attacked Pennington's friend. They beat Pennington's friend until Pennington drove up to their location in Pennington's vehicle at which time Pennington and his friend managed to escape.

  The testimony at trial established that Jason and Anthony decided to take Anthony's truck on April 4, 2011 because Pennington would not know that Anthony and Jason were in the truck. The testimony further established that Anthony did not use alcohol or drugs and was the one who drove that night. They all drove in Anthony's

2

truck to Pennington's residence in Letcher County, Kentucky. On the way to Pennington's home, Jason and Anthony talked about killing Pennington and disposing of his body by dumping it off the mountain. Once at Pennington's home, Ashley and Alexis went inside at the request of Jason and Anthony and asked Pennington to go with them to get drugs knowing the true purpose was for Jason and Anthony to kill Pennington.

As established during the testimony of Pennington, Ashley and Alexis at trial, Pennington asked Ashley and Alexis who was in the truck with them and they falsely told him their "boyfriends." Based upon their false representations, Pennington agreed to go with them. The dome light was turned off to hide the identities of Jason and Anthony. Jason and Anthony also took actions to conceal themselves. Jason was wearing a hooded sweatshirt and had it pulled over his face and Anthony wore a jacket and a ball cap which he pulled down over his face at the time Pennington entered the truck. Jason and Anthony turned their faces away from Pennington when Pennington entered the truck.

Anthony initially drove to a parking lot by an old middle school. When they left the middle school parking lot, Anthony drove towards Kingdom Come State Park. Alexis accidently turned on the dome light at which time Pennington was able to see that it was Jason and Anthony in the front seat of the truck. Pennington asked them repeatedly to let him out of the truck or to take him home. As established through the testimony of multiple witnesses during trial and by photographs of the truck introduced during trial, the rear door of this style truck cannot be opened from the inside unless the front door is opened first. Therefore, Pennington was trapped inside. Contrary to

3

Pennington's repeated pleas to be let out of the truck, Anthony, the one person in the truck without a drug or alcohol addiction, drove along US highway 119 to Kingdom Come State Park in Harlan County. During the drive, Jason made sexual threats to Pennington, including but not limited to, telling Pennington, "suck my dick, faggot." Jason also told Pennington, "I am going to fuck you in the ass dry until you bleed to death."

Pennington continued to ask them to be let out of the truck. Ignoring his requests, Anthony proceeded to drive several miles into the most remote area of Kingdom Come State Park with no lighting. Anthony only stopped the truck after his path of travel was obstructed by a tree down across the road. When Anthony stopped the truck, both Anthony and Jason exited the truck and walked to the rear of the truck where Pennington was seated. Pennington tried to hang onto the door to prevent Anthony and Jason from opening the door. However, they were able to open the door. Pennington clung to Ashley and begged for help. Jason and Anthony pulled Pennington out of the truck and began hitting and kicking Pennington. During the beating, Anthony, Alexis, Jason, and Ashley all called Pennington derogatory names. Anthony and Jason beat Pennington with their fists and kicked him repeatedly including numerous blows and kicks to his head. Pennington was unable to fight back and was lying helplessly on the ground in a fetal position. According to the testimony of Pennington, Anthony and Jason were both wearing boots and according to the testimony of Ashley and Alexis, at least one them was wearing boots. Jason and Anthony continued to beat and kick Pennington even after he

4

was on the ground begging them to stop. During the beating, Pennington was in and out of consciousness. As Pennington was lying on the ground helpless, Jason and Anthony returned to Anthony's truck. As established during the testimony of Pennington, Ashley and Alexis, Anthony and Jason were looking for a tire iron in Anthony's truck so they could kill Pennington. When Jason and Anthony were looking for the tire iron and talking about killing Pennington, Pennington, rather than die at the hands of Anthony and Jason by way of a tire iron, managed enough strength to get up and jump over the edge of the mountain. Anthony and Jason tried unsuccessfully to find Pennington after he jumped off the mountain. Jason, Anthony, Ashley and Alexis all got back in the truck.

   Jason and Anthony decided they needed to go back to Pennington's residence to finish the job. When they arrived there, Pennington was not home. Jason told Ashley and Alexis to tell Pennington's sister that Pennington ripped them off to make it look like a drug deal gone bad. Anthony then drove them around town and back into Kingdom Come State Park looking for Pennington so they could kill him. Luckily for Pennington, he was able to make his way to the ranger station and call 911 before they found him. When they were unable to locate Pennington, they returned to the residence on Russell Drive. As established during the testimony of Alex Jenkins during trial, Jason and Anthony both bragged to Anthony's brother Alex about what they had done to Pennington. They were arrested hours later.

   As described during the trial testimony of multiple law enforcement officers, Jason, Anthony, Ashley and Alexis did not appear concerned after they were arrested.

5

The actions of Anthony the evening of April 4, 2011 are unthinkable and show a complete disregard for human life. Anthony had complete control of the truck used to carry out this senseless act of violence. Cold stone sober, he agreed to lure Pennington into his truck and drive him to the top of a mountain for the purpose of brutally killing him and then disposing of his body. The facts as accepted by the jury, do not support the claim by Jason and Anthony that this was no more than a minor fight resulting from a dispute over drugs. The only drugs on April 4, 2011 were those Jason, Ashley and Alexis had ingested earlier that evening prior to engaging in the brutal attack of Pennington after luring him from his home. The nature and circumstances of this offense are horrific.

While Anthony's official criminal history is limited, the acts of violence and threats of violence by Anthony before and after this offense demonstrate the need to protect the public from further acts of violence by Anthony. Two years prior to his involvement in the brutal attack of Pennington, Anthony assisted Jason in carrying out a brutal attack on Pennington's friend. Less than one month before this offense, Anthony assaulted a Hispanic male. His conduct led to his indictment for 4th Degree Assault which was dismissed after the victim was accidently deported. The details of this offense were brought out during the detention hearing of Anthony through Angela Burke. [Angela Burke, TR (Detention) at 95-100, attached as Exhibit 1.] As set forth in detail during her testimony, Anthony assaulted a male in a park who was hanging out with Alexis and others. They initially called the police and falsely reported that the male had tried to rape Alexis which was the reason they beat the victim. Later, they admitted to

6

Ms. Burke that they had planned to rob that victim but the victim only had one dollar so they assaulted the victim who suffered numerous injuries to his face. The case was dismissed against Anthony after the victim was accidently deported and therefore unavailable for trial. In addition to Anthony's violent assault on a Hispanic victim within weeks of his attack of Pennington, Anthony's brother-in-law, Richard Raleigh, took out an Emergency Protective Order against Anthony on December 19, 2011, for attacking Mr. Raleigh and Mr. Raleigh's teenage son with multiple items including a tire iron, axe handle and sledge hammer when he had a disagreement with Mr. Raleigh when Anthony was told by family members who had custody of Anthony's son that Anthony could not his son out of the state. (See EPO paperwork attached as Exhibit 2; [Tracy Raleigh, TR (Detention) at 280-283, attached as Exhibit 3.]

Further, Anthony has a history of domestic violence against Alexis including a beating that caused Alexis to have a miscarriage. This information was presented during the detention hearing in this matter through the testimony of FBI Special Agent Mike Brown and Angela Burke. According to Angela Burke's testimony, Alexis came to stay with Ms. Burke at the end of 2011 and confided in Ms. Burke that Anthony kicked Alexis in the stomach and caused her to have a miscarriage. Ms. Burke gave this information to the FBI agents when Ms. Burke came to testify in January of 2012. [Angela Burke, TR (Detention) at 100-103.] Agent Brown spoke to Alexis in April of 2012 about this alleged assault. Alexis advised agent Brown that she went to the hospital in September of 2011 after Anthony kicked her in the stomach and it was determined that she had a

7

miscarriage. She further advised Agent Brown that in December of 2011, she went to the hospital and had several stitches in her head as the result of Anthony beating her head into a wooden deck. She advised Agent Brown that the reason she did not report the assaults to hospital staff was because Anthony was with her on both occasions and she was scared. [Mike Brown, TR (Detention) at 24-26 and 90-91, attached as Exhibit 4.]

The Court is also very familiar with the underlying facts of this case from presiding over the jury trial which involved a coldblooded attempt to kill Pennington after luring him into Anthony's truck with no way out. Anthony played a leadership role in this offense by using his close relationship with both Ashley and Alexis to persuade them to assist in carrying out the murder of Pennington that Jason and Anthony otherwise could not accomplish based on the prior attack on Pennington's friend witnessed by Pennington.

When considering the factors set forth in 18 U.S.C. § 3553(a), including the history and characteristics of the Defendant, the seriousness nature of this offense, the need to promote respect for the law, the need to deter others from similar crimes, the need to provide the Defendant with necessary treatment, and the need to protect the public from future crimes of the Defendant, a guideline sentence is appropriate. Based upon the Defendant's history of violence against others during the same time period including strangers and his own family members, the leadership role he played in this offense by driving his truck and using his relationship with Alexis and Ashley to persuade them to assist he and Jason in carrying out their goal of killing Pennington, his complete lack of

8

remorse and lack of value for another person's life and the unthinkable underlying facts of this offense, a sentence of 235 months imprisonment is warranted.

### RESPONSE TO DEFENDANT'S OBJECTION TO A TWO-LEVEL INCREASE FOR SERIOUS BODILY INJURY PURSUANT TO U.S.S.G. §2A4.1(b)(2)(B)

The injuries inflicted upon Pennington as set forth during his testimony at trial and corroborated by the photographs, the testimony of emergency personnel and law enforcement that observed him shortly after he was attacked and medical records clearly support a two point enhancement for serious bodily injury. The Advisory Sentencing Guidelines define serious bodily injury as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G § 1B1.1 comment n. 1(L).

As established during his testimony, photographs and the medical records, Pennington sustained injuries that required him to be taken by ambulance to an emergency room for treatment. (Emergency room medical records to be introduced under seal at the sentencing hearing). During the attack, Pennington lost consciousness which is clearly an impairment of his mental faculty. [Kevin Pennington, TR (Jury Trial, Day 2) at 192.] The other injuries to Pennington included boot prints and scratches and scrapes on his face, bruising and a torn ear that caused bleeding and scratches and bruises down his shoulders and back. He also suffered scratches and gouges on his left leg that became darker and were painful. When Pennington came home from the hospital, he was

not even able to lift his arms above his head. Additionally, Pennington suffered a severe sprained ankle while fleeing from Anthony and Jason that required him to walk on crutches and wear a splint for about two months. [Id. at 208-214.] Agent Brown viewed Pennington's ankle in October of 2011, approximately six months after the attack, and as established during Agent Brown's testimony at the detention hearing in this matter, Pennington's ankle still appeared to be swollen and had some discoloration to it. [Mike Brown, TR (Detention) at 23.]

In *United States v. Thompson*, 60 F.3d 514 (8th Cir. 1995), the defendant was convicted of assaulting a federal law enforcement officer. The court in *Thompson* over the defendant's objection, ruled that an enhancement for inflicting serious bodily injury was appropriate. *Id*. at 518. The court, citing U.S.S.G. § 1B1.1, imposed an enhancement for serious bodily injury based on the fact the victim's injuries required hospitalization, albeit briefly, and involved the impairment of his mental faculties when he was knocked unconscious. *Id*. See also, *United States v. Webster*, 500 F.3d 606, 607-608 (7th Cir. 2007), in which the court not only found scars to be serious bodily injury as the defendant requested, but determined the victim's scars to be an obvious disfigurement and thus permanent pursuant to the definition in U.S.S.G. § 1B1.1. While the United States is not requesting a three-level increase based on the extent of Pennington's injuries, the injury to Pennington's ankle which has left his ankle enlarged, caused by his desperate attempt to escape from Anthony and Jason who were looking for a tire iron to kill him, like the scars the victim sustained in the *Webster* case, certainly meet the

definition of serious bodily injury as set forth in U.S.S.G. § 1B1.1.  See also, *United States v. Tipton*, 11 F.3d 602, 609-610 (6th Cir. 1994), in which the court found that the rape of the victim was bodily injury and that the follow-up examination in which the physician had to probe inside of the victim's body was serious bodily injury as defined in U.S.S.G § 1B1.1.  The court relied on the victim's testimony that she was in terror, or in intense pain and that when the police observed her she was very frightened, shaking and crying and that when the physician used a vaginal speculum she flinched and moaned or yelled out.  *Id*. at 610.  The court also found that the extreme trauma the victim was subjected to during the course of the incident was sufficient to constitute an impairment of a mental faculty.  *Id*. at 609.  Likewise, the extreme trauma that Pennington was subjected to during this offense as set forth in graphic detail at trial and the long lasting emotional effects as set forth in Pennington's victim impact statement, is sufficient to constitute an impairment of a mental faculty warranting the two point enhancement for serious bodily injury pursuant to U.S.S.G. 2A4.1(b)(2)(B).

     For these reasons, contrary to Anthony's claims, the definition of  "bodily injury" does not apply to Pennington's injuries.   The Advisory Sentencing Guidelines define "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious or is of a type for which medical attention ordinarily would be sought."   U.S.S.G. § 1B1.1 comment at n. 1(B).  This provision applies "even if the victim does not seek medical attention."  *United States v. Hamm*, 13 F.3d 1126, 1128 (7th Cir. 1994) (affirming application of "bodily injury" provision for a victim who suffered "bumps and bruises

11

and 'had the wind knocked out of him'"). The "bodily injury" provision therefore covers injuries that are less severe than Pennington suffered. It applies, for example, to a teller who had her face slapped twice during a bank robbery, *United States v. Greene*, 964 F.2d 911, 912 (9th Cir.1992), or to a woman who hit her head and hip on a drawer in the course of lying down on the floor during a robbery, *United States v. Fitzwater*, 896 F.2d 1009, 1012 (6th Cir.1990).

For the reasons set forth above, the United States respectfully requests that the two-level increase for "serious bodily injury" be applied.

### RESPONSE TO DEFENDANT'S OBJECTION TO A TWO-LEVEL INCREASE FOR USE OF A DANGEROUS WEAPON PURSUANT TO U.S.S.G. §2A4.1(b)(3)

The use of boots and/or tennis shoes by Anthony to repeatedly kick and stomp Pennington in the head as he was lying helplessly on the ground as established during his testimony and the testimony of Alexis and Ashley at trial and corroborated by the photographs and the testimony of law enforcement officers at trial who observed what appeared to be a boot print on his face, clearly support a two-level increase for use of a dangerous weapon. The Advisory Sentencing Guidelines define dangerous weapon as (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a

12

hand in a towel during a bank robbery to create the appearance of a gun). U.S.S.G § 1B1.1 comment n. 1(D).

As established during the trial testimony, Anthony and Jason threw Pennington on the ground and began stomping his head with boots and/or tennis shoes repeatedly to the point he became unconscious. [Kevin Pennington, TR (Jury Trial, Day 2) at 191-192.] Alexis observed Jason wearing steel-toed boots when they left to go to Pennington's home. [Alexis Jenkins, TR (Jury Trial, Day 3) at 185.]

Pennington was kicked with steel-toed boots and tennis shoes as Pennington was balled up. [Ashley Jenkins, TR (Jury Trial, Day 2) at 56-57.] They were kicking and hitting Pennington so hard you could hear the impact and they also stomped on Pennington. [Alexis Jenkins, TR (Jury Trial, Day 3) at 208-209.]

Anthony argues that he was not wearing boots and that kicking Pennington with tennis shoes does not warrant a two level enhancement for use of a dangerous weapon. Anthony's argument is not supported by the facts or the case law. First, for purposes of the Guidelines, it also does not matter whether Anthony or Jason was wearing the steel-toed boots. Calculating the relevant conduct under the Guidelines includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). *See also United States v. Fitzwater*, 896 F.2d 1009 at 1012, (holding that the court properly applied a sentencing enhancement for bodily injury to the defendant, who was outside in the getaway car when the victim sustained an injury inside the bank during a robbery). The Court heard

13

testimony that established either both Anthony and Jason or one of them wore steel-toed boots, and that Pennington's head appeared to have a boot-print-shaped bruise. As such, it is of no matter whether Anthony himself was shod with those boots, as his actions certainly aided and abetted Jason's use of the boots.

Second, even if Anthony and Jason kicked Pennington while only wearing tennis shoes, the enhancement of a "dangerous weapon" would still apply. In *United States v. Tolbert*, 668 F.3d 798, 800-801, (6th Cir. 2012), the court citing U.S.S.G. §1B1.1 found that a water pitcher used to strike the victim in the head, if swung with sufficient force and proper aim, was capable of inflicting serious bodily injury as defined by the Guidelines and therefore met the definition of a dangerous weapon. *Id*. at 801-02. In the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs. *Id*. at 803. (Internal citations omitted.)

The force used and number of times Anthony and Jason kicked and stomped Pennington in the head and face wearing either boots or tennis shoes in these circumstances meet the definition of a dangerous weapon pursuant to U.S.S.G. 2A4.1(b)(3). For the reasons set forth above, the United States respectfully requests that the two-level increase for use of a dangerous weapon be applied.

## RESPONSE TO DEFENDANT'S OBJECTION TO A TWO-LEVEL INCREASE FOR OBSTRUCTION OF JUSTICE PURSUANT TO U.S.S.G. §3C1.1

The letters Anthony wrote to Alexis prior to trial telling her to watch what she says and telling her not to get up on the stand against him warrant a two point enhancement for obstruction of justice. This enhancement applies if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. U.S.S.G. § 3C1.1. Obstructive conduct can vary widely in nature, degree of planning, and seriousness. *Id*. at n. 3. One of a non-exhaustive list of examples of the types of conduct to which this adjustment applies is threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so. *Id*. at n. 4(A). Another is committing, suborning, or attempting to suborn perjury. *Id*. at n. 4(B).

As established during the testimony of Alexis during trial, Anthony wrote multiple letters to Alexis telling her to watch what she said at trial and asking her not to get up on the stand. Specifically, in a letter postmarked September 7, 2012, he wrote "remember what I told you if you love me at all just watch what you say babe I wish you just say no your not going to get up and say anything babe." In another letter dated August 29, 2012, he wrote "I know they are going to give you a time off your time but it wont be but a few months so think real hard on what you say babe." [Alexis Jenkins, TR (Jury Trial,

Day 3) at 235; trial exhibits, 21A and 21B.]  The letters are attached to the Presentence Report in their entirety and not once does Anthony accuse Alexis of lying.  Instead, as set forth in trial exhibits 21A and 21B, Anthony makes a plea to Alexis not to testify against him or, alternatively, to testify in a way that will not hurt him.

Contrary to Anthony's claim the letters were not written to attempt to influence the testimony of Alexis, read in part or their entirety, he made numerous efforts to try to get Alexis not to testify or limit what she said during her testimony so he would not get in trouble.    Anthony's conduct as set forth in the letters that were sent to a material witness against him in the weeks leading up to trial, fits squarely into U.S.S.G. § 3C1.1.

In *United States v. Bingham*, 81 F.3d 617, 632 (6th Cir. 1996),  the court upheld a two-level increase for obstruction of justice where the defendant wrote letters before and during trial to his girlfriend and his girlfriend testified that he told her that if she did not testify that a particular gun was hers he would get into a lot of trouble and where he told her in letters to make certain that she not discuss at trial how he fronted drugs, that he worked with anyone, or that he had anyone working for him, all issues critical to finding that he was involved in a conspiracy.    The court examined all of the letters and found that the defendant, albeit, indirectly and perhaps even somewhat ambiguously, to have his girlfriend conform to his desires.    Similar to the defendant in the *Bingham* case, Anthony's statements in the letters telling Alexis to watch what she said and that it would not be good for him if she testified were made to have her testimony conform to Anthony's desires.    See also, *United States v. Waldon*, 206 F.3d 597, 608 (6th Cir. 2000),

16

a case in which the court imposed a two level increase for obstruction of justice based on the defendant's unsuccessful attempt to persuade the owner of the getaway car to report the car as stolen, though the defendant's actions did not actually hinder the criminal investigation.   Even though Anthony's attempt to influence the testimony of Alexis or her willingness to testify at trial was unsuccessful, his attempt to do so is sufficient to apply a two level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

For the reasons set forth above, the United States respectfully requests that the two-level increase for obstruction of justice be applied.

>
> Respectfully submitted,
>
> KERRY B. HARVEY
> UNITED STATES ATTORNEY
>
> THOMAS E. PEREZ
> ASSISTANT ATTORNEY GENERAL
> CIVIL RIGHTS DIVISION
>
> By:    s/Hydee R. Hawkins
>        Assistant United States Attorney
>        260 West Vine Street
>        Suite 300
>        Lexington, KY  40507-1612
>        (859) 685-4881
>        Hydee.hawkins@usdoj.gov
>
> By:    s/Angie Cha
>        Aejean (Angie) Cha
>        Trial Attorney, Civil Rights Division, DOJ
>        950 Pennsylvania Ave, NW – PHB
>        Washington, DC 20530
>        (202) 514-3204
>        aejean.cha@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on February 15, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send an electronic notice to the following registered CM/ECF participants:

    Willis G. Coffey
    Counsel for Anthony Ray Jenkins

                                                  s/Hydee R. Hawkins
                                                  Assistant United States Attorney